UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CHRISTINE DONA BUTLER,           :
                                 :CIVIL ACTION NO. 3:15-CV-1923
          Plaintiff,             :
                                 :(JUDGE CONABOY)
          v.                     :
                                 :
CAROLYN W. COLVIN,               :
Acting Commissioner of           :
Social Security,                 :
                                 :
          Defendant.             :
                                 :

_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the
Commissioner's denial of Disability Insurance Benefits ("DIB")
under Title II of the Social Security Act.  (Doc. 1.)  She alleged
disability beginning on July 19, 2012. (R. 28.)  The Administrative
Law Judge ("ALJ") who evaluated the claim, Michelle Wolfe,
concluded in her January 29, 2015, decision that Plaintiff's severe
impairments of bipolar disorder, fibromyalgia, and MTHFR mutation
did not alone or in combination meet or equal the listings.  (R.
31-34.)  She also found that Plaintiff had the residual functional
capacity ("RFC") to perform light work with certain nonexertional
limitations and that she was capable of performing jobs that
existed in significant numbers in the national economy.  (R. 34-
40.)  ALJ Wolfe therefore found Plaintiff was not disabled under
the Act from July 19, 2012, through December 31, 2013, the last
date insured.  (R. 26.)

With this action, Plaintiff asserts that the Acting Commissioner's decision should be remanded for the following reasons: 1) the ALJ erred by finding Plaintiff's bilateral ulnar neuropathy to be a non-severe impairment; 2) the ALJ did not assign the proper weight to the opinion of the treating primary care physician; 3) the ALJ did not assign the proper weight to the opinions of the treating psychiatrist and treating therapist; 4) the ALJ failed to include all of Plaintiff's limitations in the hypothetical question posed to the vocational expert; and 5) the ALJ erred in failing to find that Plaintiff was limited to no more than sedentary exertion and therefore disabled as of her date last insured.  (Doc. 14 at 4-17.)  After careful review of the record and the parties' filings, I conclude this matter is properly remanded.

## I. Background

### A.    *Procedural Background*

Plaintiff filed for DIB on December 17, 2013.  (R. 28.)  The claim was initially denied on February 6, 2014, and Plaintiff filed a request for a hearing before an ALJ on April 1, 2014.  (*Id.*)

ALJ Wolfe held a hearing on January 26, 2015.  (R. 19.) Plaintiff, who was represented by an attorney, testified as did Vocational Expert ("VE") Carmine Abraham.  (*Id.*)  As noted above, the ALJ issued her unfavorable decision on January 29, 2015, finding that Plaintiff was not disabled under the Social Security

Act during the relevant time period.  (R. 40.)

On February 11, 2015, Plaintiff filed a Request for Review with the Appeals Council.  (R. 23-24.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on August 4, 2015.  (R. 1-6.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On October 4, 2015, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on December 10, 2015.  (Docs. 10, 11.)  Plaintiff filed her supporting brief on February 29, 2016.  (Doc. 14.)  Defendant filed her brief on April 4, 2016.  (Doc. 15.)  Plaintiff filed her reply brief on May 5, 2015.  (Doc. 18.)  Therefore, this matter is fully briefed and ripe for disposition.

**B.    *Factual Background***

Plaintiff was born on January 2, 1964.  (R. 39.)  She was fifty-one years old on the date of the ALJ's decision.  (Doc. 14 at 2.)  She completed high school and two years of college.  (R. 51.) Plaintiff has past relevant work as a cake decorator, gas station attendant, and pharmacy technician.  (R. 39.)

**1.    Impairment Evidence**

The following review of evidence focuses on that relied upon by the parties and relevant to the errors asserted by Plaintiff. Records preceding the relevant time period will be set out only for

3

background purposes.[1]

*a.   Ulnar Neuropathy*

     On November 25, 2008, Lisa A. Mucciolo, M.D., of Susquehanna
Valley Orthopaedic Associates, P.C., saw Plaintiff on referral of
Plaintiff's primary care physician, Leon Francis, M.D.  (R. 594.)
The reason for the referral was consultation for Plaintiff's all
over body pain.  (*Id.*)  Dr. Mucciolo noted that Plaintiff "was a
cake decorator for many years and overworked to the point of nerve
damage.  This was surgically repaired x2 on the right with mediocre
result."  (*Id.*)  At the time, examination showed tremor in the

---

     [1] Our review of the evidence is guided by the fact that an
unfavorable decision on Plaintiff's prior application indicates
that the Court is now barred from consideration of the period on or
before June 18, 2012, as explained in Defendant's brief.

          Plaintiff filed a prior application for
          DIB on March 15, 2010, which was denied by a
          different ALJ on June 18, 2012 (Tr. 28, 128-
          47).  On September 24, 2013, the Appeals
          Council denied Plaintiff's request for review
          (Tr. 149).  Plaintiff did not appeal the
          Appeals Council's determination, thereby
          making the ALJ's June 18, 2012 opinion the
          final decision of the Commissioner.  20
          C.F.R. § 404.981.  Because the ALJ in the
          instant action found no basis to re-open
          Plaintiff's prior application, the previous
          unfavorable determination is binding and
          consideration of the period on or before June
          18, 2012 is barred by *res judicata* (Tr. 28).
          *See* 20 C.F.R. §§ 404.987-404.989; *see also* 20
          C.F.R. § 404.957(c)(1) (the doctrine of *res
          judicata* bars the ALJ from reconsidering the
          time period covered under a previous denial).

(Doc. 15 at 3 n.2.)

right hand.  (R. 595.)

During the relevant time period Dr. Mucciolo was Plaintiff's
treating rheumatologist with records indicating that Plaintiff was
seen in September 2012 and March, June, and October 2013.  (R. 384,
392, 402, 411.)  At Plaintiff's September 2012 visit, Dr. Mucciolo
noted that neuro examination showed a tremor in the right hand "as
before."  (R. 385.)  This was not noted at other visits.
Examination of the joints and extremities was consistently normal
except for positive fibromylagia trigger points.  (R. 385, 393,
403, 412.)

The records show that Plaintiff visited Dr. Francis, her
primary care physician, once during the relevant time period.  (R.
363.)  At her March 12, 2013, office visit, ulnar neuropathy was
not identified as a problem nor was it addressed in the Physical
Exam or Assessment portions of the notes.[2]  (R. 363-65.)

---

[2] After the relevant time period, Plaintiff continued to
treat with Dr. Mucciolo who noted "no . . . neuro symptoms" in May
2014, normal neuro findings on examination, and the notation
"+tremor R hand (stable)" under examination of the extremities.
(R. 573.)  In October 2014, Dr. Mucciolo's physical examination
showed no upper extremity weakness and "+ resting tremor R>L."  (R.
570.)

She also continued to treat with Dr. Francis who noted in
April 2014 that Plaintiff had a history of bilateral ulnar
neuropathy.  (R. 502.)  The "Physical Exam" portion of the office
notes indicates "[n]one recorded."  (R. 502.)

*b.   Fibromyalgia*

Plaintiff had a longstanding fibromyalgia diagnosis for which she was treated well before the relevant time period.  (*See* R. 580-95.)  In April 2011, Dr. Mucciolo noted that Plaintiff was "all in all doing ok" and that "darvocet worked great."  (R. 580.)

At Plaintiff's first visit with Dr. Mucciolo during the relevant time period, Plaintiff reported minimal improvement of her symptoms which included diffuse polyarthralgias, sensitivity to touch, and "fibrofog."  (R. 384.)  Dr. Mucciolo noted "[n]eeds refill on vicodin--rarely uses and old one had expired."  (*Id.*)  Physical examination showed that Plaintiff was alert, healthy, and in no distress and she was "[f]ibromyalgia tender positive at: lower cervical, trapezius, sacroiliac joint and trochanteric region."  (R. 385.)  Dr. Mucciolo's assessment was that Plaintiff was tolerating her current therapy and it would be continued. (*Id.*)

On March 12, 2013, Plaintiff saw Dr. Francis with the chief complaint of depression.  (R. 363.)  "Myalgia" was listed under "Problems" with an onset date of November 14, 2008.  (*Id.*)  Physical examination was generally unremarkable and Dr. Francis noted that Plaintiff appeared healthy and ambulated normally.  (R. 364.)

On March 13, 2013, Plaintiff reported to Dr. Mucciolo that she was doing fairly well, and she had fibromyalgia symptoms of pain

all over, fatigue, and non-restorative sleep.  (R. 392.)  Plaintiff also reported that she rarely used vicodin.  (*Id.*)

At her June 2013 office visit, Plaintiff reported that she had just gotten home after helping out with her seventy-year-old mother who had broken her hip.  (R. 402.)  Dr. Mucciolo noted that Plaintiff appeared alert, healthy, and in no distress with "f]ibromyalgia tender positive at: trapezius, sacroiliac joint and trochanteric region."  (R. 403.)

In October 2013, Plaintiff said she was not doing well.  (R. 411.)  She told Dr. Mucciolo that the family was down to one car and she was shuttling her husband and daughter to work which entailed being up every four hours beginning at 4:30 a.m. and ending at midnight.  (*Id.*)  Plaintiff also reported that, although vicodin helped, it made her tired and she rarely took it.  (*Id.*)  Her physical examination was again unremarkable except for the same positive fibromyalgia points noted at the previous visit.  (R. 412.)  Dr. Mucciolo opined that Plaintiff's increased pain was likely due to stress/not sleeping and she would adjust her medications.[3]  (*Id.*)

c.  *Bipolar Disorder*

---

[3]  As noted previously, Plaintiff treated with both Dr. Mucciolo and Dr. Francis after the relevant time period.  Plaintiff continued to report fibromyalgia symptoms but reported she was doing pretty well and that she rarely took Tramadol or vicodin. (R. 569, 572-3.)

Since 2010, Plaintiff has seen Mark Saxon, D.O., for medication management of her mental health impairments.  At the initial clinical assessment in December 2010, Plaintiff identifed anxiety and depression as the reason for seeking services.  (R. 346.)  Dr. Saxon diagnosed Bipolar Disorder Type II.  (R. 356.)  He noted psychosocial and environmental problems to be financial stressors, a son with aspergers, and many surgeries.  (*Id.*)  Dr. Saxon assessed a GAF of 60.  (*Id.*)

At Plaintiff's January 2012 visit, Dr. Saxon recorded the following mental status: coherent speech; at times depressed and at times anxious mood; appropriate affect; intact orientation; intact memory; relevant thought process; reality based thought content; intact judgment; casual appearance; cooperative attitude; at times hyperactive motor activity; normal gait, muscle strength and tone; no suicidality or homicidality; and sufficient impulse control. (R. 554.)   Plaintiff's "Global Self Report Rating" of symptom severity was four and side effects zero on a scale of zero to ten where zero equals no symptoms, ten equals moderate, and ten equals extreme.  (*Id.*)  The "Clinician Symptom Rating," which operates on the same scale, indicated depression of four, irritability of two, anxiety of six, pain of five, and side-effect severity rating of zero.  (*Id.*)  Dr. Saxon rated Plaintiff's "Overall Function Status Rating" to be seven on a scale of zero to ten, where zero equals low and ten equals high.  (*Id.*)

In October 2012, Plaintiff's Mental Status Exam was much the same, the only difference being that her motor activity was calm rather than hyper-active at times.  (R. 442, 554.)  Plaintiff's "Global Self Report Rating" of symptom severity was two to three and side effects zero. (R. 442.)  The "Clinician Symptom Rating" indicated depression of three, irritability of one, anxiety of two, insomnia of one, and side-effect severity rating of zero.  (*Id.*) Dr. Saxon rated Plaintiff's "Overall Function Status Rating" to be eight to nine where ten equals high.  (*Id.*)

In January 2013, Dr. Saxon's Mental Status Exam was similar with her motor activity again rated hyperactive at times.  (R. 440.)  Plaintiff's "Global Self Report Rating" of symptom severity was four to five and side effects zero. (R. 442.)  The "Clinician Symptom Rating" indicated depression of five to six, irritability of one, anxiety of four, insomnia of one, and side-effect severity rating of zero.  (*Id.*)  Dr. Saxon rated Plaintiff's "Overall Function Status Rating" to be seven to eight.  (*Id.*)

In April 2013, Mental Status Exam was essentially the same as the previous visit.  (R. 438, 442.)  Plaintiff's "Global Self Report Rating" of symptom severity was three to four and side effects zero. (R. 442.)  The "Clinician Symptom Rating" indicated depression of four, anxiety of three, insomnia of one, and side-effect severity rating of zero.  (*Id.*)  Dr. Saxon rated Plaintiff's "Overall Function Status Rating" to be eight.  (*Id.*)

9

July 2013 Progress Notes indicate the same Mental Status Exam findings. (R. 435, 438.) Plaintiff's "Global Self Report Rating" of symptom severity was three and side effects zero. (R. 435.) The "Clinician Symptom Rating" indicated depression of two, irritability of one to two, anxiety of one to two, insomnia of zero, and side-effect severity rating of zero. (*Id.*) Dr. Saxon rated Plaintiff's "Overall Function Status Rating" to be eight to nine. (*Id.*)

Progress Notes from October 2013 show similar Mental Exam Status findings. (R. 433, 435.) Plaintiff's "Global Self Report Rating" of symptom severity was five and side effects zero. (R. 442.) The "Clinician Symptom Rating" indicated depression of three, irritability of one to tow, anxiety of three, energy of six, insomnia of seven, and side-effect severity rating of zero. (*Id.*) Dr. Saxon rated Plaintiff's "Overall Function Status Rating" to be seven. (*Id.*)

During the same time period, Plaintiff saw Trudy Frace, a licensed social worker, for counseling. Plaintiff's mood in the sessions during the relevant time period was often reported to be frustrated, angry, and/or overwhelmed; her affect was at times normal/appropriate and at others intense; her mental status ranged from normal to "lessened awareness"; her treatment compliance was routinely good; and her general level of progress was consistently good. (*See*, *e.g.*, R. 455, 480.) Plaintiff's stressors were often

reported to be family related and the need for her to set boundaries and request more help from other members of the household.  (*See*, *e.g.*, R. 451, 461, 479, 481.)  Occasionally Plaintiff's mood was optimistic.  (R. 459, 479.)

In December 2012, the possibility was raised that Plaintiff suffered from seasonal affective disorder because of increased symptoms and methods of relieving the symptoms were explored.  (R. 477.)  In March 2013, Plaintiff reported that her primary care physician had found that she had a thyroid problem which could be a big part of her exhaustion and higher level of depression and she had begun taking medication for the problem.  (R. 465.)  In April 2013, Plaintiff reported that for the month of May she would be at her mother's helping because her mother would be on crutches for four to six weeks post hip surgery.  (R. 462.)  At the same visit, Plaintiff expressed concern about accomplishing all she needed to get done before going to her mother's in New Jersey; she decided that she would make lists and delegate some of the work.  (*Id.*)  In June 2013, Plaintiff reported that her mother wanted her to come visit more, and Ms. Frace noted that this would be a good change for her.  (R. 459.)  In August 2013, Mr. Frace reported that Plaintiff said she was struggling with guilt because "she is not able to do everything she wants to do plus work a job to earn money."  (R. 456.)

At her visits with Dr. Mucciolo during the relevant time

11

period, physical examination showed that Plaintiff was alert, healthy, and in no distress. (*See*, *e.g.*, R. 385, 403, 412.)   In March 2013, Plaintiff reported that she generally had a harder time over the winter season due to seasonal affective component and she had been in bed for a few weeks because she just did not feel like doing anything. (R. 392.)  The "Psych" portion of the physical exam indicated that Plaintiff was alert and oriented and had normal and appropriate mood and affect. (R. 393.)

During the relevant time period, Plaintiff had a check up with Dr. Francis and Plaintiff said she really struggled with depression relating the "end of winter" time period. (R. 363.)  Notes from the March 12, 2013, office visit indicate that no review of systems was recorded and physical examination showed that Plaintiff's general appearance was healthy and she was in no apparent distress. (R. 364.)  Dr. Francis recorded the following psychiatric examination findings: "Insight: good judgment.  Mental Status: active and alert, normal affect, and **depressed.**  Orientation: to time, place, and person.  Memory: recent memory normal and remote memory normal.  Thought Process and Content[:] no delusions, hallucinations, fleetness of ideas, looseness of association, suicidal ideations, or homicidal ideations and logical, goal directed." (*Id.*)  His Assessment included Bipolar Disorder, Unspecified, and Generalized Anxiety Disorder. (*Id.*)

2.    **Opinion Evidence**

12

a.   *State Agency Psychologist*

State agency psychologist Francis Murphy, Ph.D., completed a Psychiatric Review Technique ("PRT") and conducted a Mental Residual Functional Capacity Assessment on February 2, 2014, which applied to the date last insured of December 31, 2013, period.  (R. 153-58.)  Under paragraph B, Dr. Murphy found mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (R. 153.)  In the Mental RFC, Dr. Murphy opined that Plaintiff had no understanding or memory limitations.  (R. 157.)  He concluded that Plaintiff had limitations in sustained concentration and persistence though she was not significantly limited in most subcategories.  (R. 157.)  He found the only area in which Plaintiff was moderately limited was in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  (*Id.*)  Dr. Murphy concluded that Plaintiff was capable of engaging in simple repetitive work activities on a sustained basis in spite of her limitations.  (*Id.*)

b.   *Psychiatrist Medical Source Statement*

Dr. Saxon completed a Medical Source Statement on July 15, 2014.  (R. 484-87.)  He stated on December 15, 2014, that Plaintiff had the same conditions and limitations identified in the statement

13

on and before December 31, 2013.  (R. 492.)

Dr. Saxon identified Plaintiff's signs and symptoms as follows: poor memory at times; sleep disturbance; mood disturbance; emotional lability; recurrent panic attacks; anhedonia or pervasive loss of interests; feelings of guilt/worthlessness; difficulty thinking or concentrating; history of suicidal ideation or attempts but none presently; social withdrawal or isolation at times; blunt, flat or inappropriate affect; decreased energy; manic syndrome at times; generalized persistent anxiety; and hostility and irritability.  (R. 484.)  In response to the question of what clinical findings demonstrate the severity of the mental impairment and symptoms, Dr. Saxon stated that Plaintiff admits to episodes of depression and anxiety and states that the anxiety sometimes results in panic attacks, and she reports consistent low energy levels as well as anhedonia.  (R. 485.)  Dr. Saxon's prognosis was fair to guarded which he supported with the explanation that, although Plaintiff has support systems, she continues to have episodes where she does well and then she falters.  (R. 485.)  He opined that Plaintiff's psychiatric condition exacerbated her experience of pain, an opinion based on Plaintiff's statement that depression sometimes increases episodes of fibromyalgia.  (*Id.*) Dr. Saxon noted that Plaintiff did not have a low I.Q. or reduced intellectual functioning.  (*Id.*)  He concluded that Plaintiff would miss work on average more than three times per month due to

14

exacerbations of her impairments.  (R. 486.)  Dr. Saxon opined that
Plaintiff had many moderate limitations in her abilities and
aptitudes related to unskilled work and she had marked limitations
in her abilities and aptitudes for the following: maintain
attention for a two-hour segment; maintain regular attendance and
be punctual within customary tolerances; sustain an ordinary
routine without special supervision; perform at a consistent pace
without an unreasonable number and length of rest periods; accept
instructions and respond appropriately to criticism from
supervisors; and respond appropriately to changes in a routine work
setting.  (*Id.*)  Dr. Saxon identified the medical/clinical findings
supporting his assessment: Plaintiff's "clinical presentation has a
propensity to change almost on a daily basis."  (R. 487.)  He added
that the limitations identified were not present on a regular basis
but occur at the times when she is not doing well.  (*Id.*)
Regarding her mental abilities and aptitudes to do semiskilled and
skilled work, Dr. Saxon concluded that Plaintiff had marked
limitations in her abilities to understand and remember detailed
instructions due to anxiety and to carry out detailed instructions.
(*Id.*)  Dr. Saxon also noted that Plaintiff was extremely limited in
her ability to travel in unfamiliar places.  (*Id.*)

c.  *Primary Care Physician Opinion*

    Dr. Francis completed a "Medical Opinion Re: Ability To Do
Work-Related Activities (Physical)" on July 23, 2014.  (R. 489-91.)
He stated on December 15, 2014, that Plaintiff had the same

conditions and limitations identified in the statement on and before December 31, 2013.  (R. 497.)

Dr. Francis set out the following findings regarding Plaintiff's physical abilities: she could lift and carry less than ten pounds on an occasional basis; during an eight-hour day she could stand and walk for less than two hours and could sit for about two hours or less ("depends"); she could sit for forty-five minutes without changing position and could stand for forty-five minutes without changing position; she needed the ability to shift at will from sitting to standing/walking; and she would need to lie down at unpredictable intervals during a work shift from one to three times daily.  (R. 489-90.)  In response to the question of what medical findings support the limitations, Dr. Francis identified elevated TSH, positive rheumatology evaluation for fibromyalgia, and a history of psychiatric problems for which Plaintiff was followed by Dr. Saxon and had weekly therapy with Ms. Frace.  (R. 490.)  Dr. Francis concluded that Plaintiff could occasionally twist, stoop (bend), crouch, climb stairs, and climb ladders.  (*Id.*)  Regarding physical functions, Dr. Francis opined that Plaintiff's abilities related to reaching (including overhead), handling (gross manipulation), fingering (fine manipulation), and feeling were affected by her impairments, stating that "numbness in hands due to bi-lateral ulnar neuropathy precludes."  (*Id.*)  Supportive medical findings were identified as

a positive rheumatology evaluation for fibromyalgia and positive for ulnar entrapment.  (*Id.*)  Dr. Francis concluded Plaintiff should avoid all exposure to extreme cold, extreme heat, wetness, humidity, noise, fumes, odors, dusts gases, poor ventilation, and hazards because of her fibromyalgia.  (*Id.*)  Finally, he concluded that Plaintiff would miss work more than three times per month because of her impairments.  (*Id.*)

3.   **Hearing Testimony**

At the January 26, 2015, ALJ Hearing, Plaintiff testified that she lived in a house with her husband, her twenty-year-old son, her son's girlfriend, her thirty-four-year-old daughter, and her daughter's four children ranging in age from ten to fifteen.  (R. 49-50.)  Plaintiff said she had not looked for work since 2012 and felt she could not return to any type of work because she spends several days a week in bed due to depression and she does not do well being around other people.  (R. 51-52.)

When asked whether she did any type of chores or activities around the house, Plaintiff responded that she did not.  (R. 53.)  She said she had stopped "a couple of years ago."  (*Id.*)  Focusing on the relevant time period, Plaintiff said she occasionally went to the store, did not do any physical therapy or exercise, and she occasionally drove her son's girlfriend to work if she could not get a ride.  (*Id.*)  When Plaintiff's attorney asked about the discrepancy between the activities reported in her January 22,

2014, Function Report and her hearing testimony, Plaintiff said her ability to do chores and activities had lessened since she completed the Function Report.  (R. 57.)  Plaintiff said that at the time of the hearing other family members did the household chores--she added that she assisted in painting part of the posts when the family painted their house.  (R. 57-58.)

The ALJ asked the VE to consider a hypothetical individual of the same age, education and work experience as Plaintiff

> and has the residual functional capacity to perform work at the light exertional level as defined by the regulations, but subject to the following: The individual would have occasional balancing, stooping, crouching, crawling, kneeling, and climbing, but never on ladders, ropes, or scaffolds.  The individual would need to avoid concentrated exposure to vibrations, as well as hazards, including moving machinery and unprotected heights.  The individual . . . can do simple routine tasks, but no complex tasks.  The individual would . . . need to be in a low stress environment, defined as occasional decision making and occasional changes in the work . . . setting, and would need to have occasional interaction with the public.

(R. 67.)  The VE testified that such an individual would not be able to perform Plaintiff's past relevant work but there were other jobs she could perform, examples being a product assembler, finisher, and packager.  (R. 67-68.)  The VE further testified that there would be no effect on these jobs if the individual were limited to occasional interaction with coworkers.  (R. 68.)  The VE stated that the jobs identified would not be available at the

18

sedentary level but other jobs would be available at that level, including bench assembler, inspector, and system monitor.  (R. 69.) When asked by the ALJ if the jobs would be affected if the individual required additional breaks throughout the workday and was off task more than twenty percent of the day, the VE responded that all positions in the hypothetical would be eliminated as well as any other type of work in the economy.  (R. 69-70.)  The ALJ then asked whether the product assembler, finisher, or packager jobs would be affected if the individual was limited to frequent grasping and fine manipulation with the right upper extremity.  (R. 70.)  The VE said there would be no effect.  (*Id.*)  The VE also testified that if grasping and manipulation were limited to occasional, the jobs identified would be eliminated and the job base would be significantly eroded.  (R. 70-71.)

Upon examination by Plaintiff's attorney, the VE testified that if the limitations set out in the opinions of Dr. Francis, Dr. Saxon, or Ms. Frace were credited, Plaintiff would not be able to do any kind of work on a full-time basis.  (R. 72-75.)

**4.   ALJ Decision**

ALJ Wolfe issued her decision on January 29, 2015.  (R. 28-40.)  She made the following Findings of Fact and Conclusions of Law:

> 1.   The claimant last met the insured status
>      requirements of the Social Security Act
>      on December 31, 2013.

19

2.    The claimant did not engage in
      substantial gainful activity during the
      period from her alleged onset date of
      June 19, 2012 through her date last
      insured of December 31, 2013 (20 CFR
      404.1571 et seq).

3.    Through the date last insured, the
      claimant had the following severe
      impairments: bipolar disorder,
      fibromyalgia (myalgia and myositis), and
      MTHFR mutation (20 CFR 404.1520(c)).

4.    Through the date last insured, the
      claimant did not have an impairment or
      combination of impairments that met or
      medically equaled the severity of one of
      the listed impairments in 20 CFR Part
      404, Subpart P, Appendix 1 (20 CFR
      404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the
      entire record, the undersigned finds
      that, through the date last insured, the
      claimant had the residual functional
      capacity to perform light work as
      defined in 20 CFR 404.1567(b).  The
      claimant could lift/carry 10 pounds
      frequently and up to 20 pounds
      occasionally.  She could sit, stand, and
      walk 6-hours each in an 8-hour workday.
      She was limited to only occasional
      balancing, stooping, crouching,
      crawling, kneeling, and climbing, but
      never on ladders, ropes, or scaffolds.
      She had to avoid concentrated exposure
      to vibrations and hazards, including
      moving machinery and unprotected
      heights.  She could perform frequent
      handling and fine manipulation.
      Mentally, she was limited to simple,
      routine tasks, but no complex tasks, in
      a low stress environment.  Low stress
      defined as occasional decision-making
      and occasional changes in the work
      setting, and occasional interaction with
      the public.

20

6.   Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on January 2, 1964 and was 49 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart, Appendix 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from June 19, 2012, the alleged onset date, through December 31, 2013, the date last insured (20 CFR 404.1520(g)).

(R. 30-40.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to

21

determine whether a claimant is disabled.[4]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); see *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional

---

[4]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 39-40.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third

Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result

but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary,

in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

### IV. Discussion

Plaintiff asserts that the Acting Commissioner's decision should be remanded for the following reasons: 1) the ALJ erred by finding Plaintiff's bilateral ulnar neuropathy to be a non-severe impairment; 2) the ALJ did not assign the proper weight to the opinion of the treating primary care physician; 3) the ALJ did not assign the proper weight to the opinions of the treating psychiatrist and treating therapist; 4) the ALJ failed to include all of Plaintiff's limitations in the hypothetical question posed to the vocational expert; and 5) the ALJ erred in failing to find that Plaintiff was limited to no more than sedentary exertion and

therefore disabled as of her date last insured.  (Doc. 14 at 4-17.)

## 1.   Step Two Determination

Plaintiff asserts that the ALJ erred in finding Plaintiff's ulnar neuropathy non-severe at step two of the sequential evaluation process.  (Doc. 14 at 4-7.)  Defendant responds that the ALJ's finding is supported by substantial evidence and, even if the Court were to find the impairment severe, the ALJ's decision does not lack substantial evidence because she did not deny the claim at step two.  (Doc. 15 at 12-16.)  I conclude that the ALJ's finding that Plaintiff's ulnar neuropathy was non-severe is not supported by substantial evidence and this error cannot be deemed harmless.

"If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met."  *Newell v. Comm'r of Social Security*, 347 F.3d [541], 546 (3d Cir. 2003).  Any doubt as to whether this showing has been made is to be resolved in favor of the applicant.  *Newell*, 347 F.3d at 546-47.  If the sequential evaluation process continues beyond step two, a finding of "non-severe" regarding a specific impairment at step two may be deemed harmless if the functional limitations associated with the impairment are accounted for in the RFC.  *Salles v. Commissioner of Social Security*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (not precedential) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)).  In other words, because the outcome of a case depends on the demonstration of

functional limitations, where an ALJ identifies at least one severe impairment and ultimately properly characterizes a claimant's symptoms and functional limitations, the failure to identify a condition as severe is deemed harmless error. *Garcia v. Commissioner of Social Security*, 587 F. App'x 367, 370 (9th Cir. 2014) (citing *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)); *Burnside v. Colvin*, Civ. A. No. 3:13-CV-2554, 2015 WL 268791, at *13 (M.D. Pa. Jan. 21, 2015); *Lambert v. Astrue*, Civ. A. No. 08-657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009).

Here the ALJ considered Plaintiff's ulnar neuropathy non-severe. (R. 31.) She did so on the following basis: "her family doctor indicates ulnar neuropathy as a diagnosis but there are no actual objective findings noted on examination, no EMG studies, and no ongoing treatment for this condition since the alleged onset date in order to support significant functional limitations as a result of her neuropathy." (R. 31 (citing Ex. B.14F/4 [R. 503]).) Although the ALJ found Plaintiff's ulnar nueropathy non-severe at step two of the sequential evaluation process, other impairments were found to be severe and Plaintiff's claim proceeded through the five-step analysis. (R. 32-40.) In determining Plaintiff's RFC, ALJ Wolfe acknowledged Plaintiff's alleged nerve damage in her arms, and the RFC included the limitation that Plaintiff "could perform frequent handling and fine manipulation." (R. 34, 35.)

Plaintiff contends that the ALJ's error was harmful because

she failed to consider the significant limitations in reaching, handling, fingering and feeling caused by the ulnar neuropathy. (Doc. 14 at 6.)  In her reply brief, Plaintiff points to evidence which supports the causal relationship of these limitations with her ulnar neuropathy and the ongoing nature of the impairment. (Doc. 18 at 2-3.)  She notes that "[t]he Commissioner's reliance on the lack of ongoing treatment for this impairment is misplaced precisely because, having failed two surgical treatments, there was nothing further to offer Ms. Butler, and the clinical focus of her physicians was instead her fibromyalgia and depression."  (Doc. 18 at 3, n.1.)

The evidence relied upon by Plaintiff includes Dr. Mucciolo's initial office visit notation in 2008 that Plaintiff had nerve damage which was surgically repaired twice on the right with mediocre result.  (Doc. 18 at 2 (citing R. 594).)  Plaintiff also points to Dr. Francis' July 2014 opinion in which he noted that Plaintiff's abilities to reach, handle, finger, feel, push, and pull were affected by numbness in her hands due to ulnar neuropathy.  (Doc. 18 at 2 (citing R. 490).)  Although Dr. Mucciolo's statement predates the relevant time period, Dr. Francis' assessment applies to the period (*see* R. 497) and the record as a whole shows the ongoing nature of the impairment without any indication that it changed markedly.  Therefore, the ALJ's reliance on the lack of objective findings during the

29

relevant time period is not adequate to support her determination.

Plaintiff also makes a cogent argument why the finding of the ALJ in the previous decision that her ulnar neuropathy impairment was severe should have been discussed by ALJ Wolfe and the different outcome explained and also why ALJ's Wolfe's decision at step two affected her RFC analysis, i.e., by definition a non-severe impairment imposes no significant limitations.  (Doc. 18 at 3-6.)

Because doubts at step two regarding the severity of an impairment are to be resolved in favor of the applicant, *Newell*, 347 F.3d at 546-47, I cannot conclude the ALJ's determination that Plaintiff's ulnar neuropathy was non-severe is supported by substantial evidence.  I further conclude that this error cannot be deemed harmless in the context of this case because whether the ALJ *properly* considered the functional limitations associated with the impairment is questionable.  Therefore, the step two determination regarding ulnar neuropathy and related RFC findings should be addressed upon remand.

## 2.   **Primary Care Physician Opinion**

Plaintiff maintains the ALJ did not assign the proper weight to the opinion of Dr. Francis.  (Doc. 14 at 7-12.)  Defendant asserts that substantial evidence supports the ALJ's determination that the opinion was entitled to little weight.  (Doc. 15 at 16-21.)  I conclude that the ALJ's consideration of Dr. Francis'

30

February 2014 opinion is cause for remand.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. *See*, *e.g.*, *Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). Sometimes called the "treating physician rule," the principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit. *Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986). The regulation addresses the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).[5] "A cardinal principle

---

[5] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief

guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); see also *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

---

hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

The Court of Appeals for the Third Circuit addressed a
plaintiff's argument that an ALJ failed to give controlling weight
to the opinion of a treating physician in *Horst v. Commissioner of
Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not
precedential).

> "Under applicable regulations and the law of
> this Court, opinions of a claimant's treating
> physician are entitled to substantial and at
> times even controlling weight." *Fargnoli v.
> Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).
> Controlling weight is given when a treating
> physician's opinion is "well supported by
> medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent
> with the other substantial evidence."  20
> C.F.R. § 404.1527(d)(2).  "Although the ALJ
> may weigh the credibility of the evidence, he
> must give some indication of the evidence that
> he rejects and his reason(s) for discounting
> that evidence."  *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46.  *Horst* noted that neither the ALJ nor the court
needed to rely on the treating physician's opinion that the
plaintiff was completely disabled: "As an initial matter, 'the
ALJ--not treating or examining physicians or State agency
consultants--must make the ultimate disability and RFC
determinations."  551 F. App'x at 46 n.7 (quoting *Chandler v.
Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); citing 20
C.F.R. § 404.1527(d)).  Although it is true that an ALJ's
credibility judgments alone cannot override a treating physician's
medical opinion that is supported by the evidence, *Morales v.
Apfel*, 225 F.3d 310, 310 (3d Cir. 2003), where an ALJ relies "upon

33

more than personal observations and credibility determinations in discounting the treating physician's finding of disability," the ALJ does not run afoul of relevant law. *Drejka v. Commissioner of Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not precedential) (distinguishing *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (holding that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence)). *Drejka* also noted that where the treating physician made the determination the plaintiff was disabled only in a form report, the Third Circuit Court has characterized a report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best.'" 61 F. App'x at 782 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

ALJ Wolfe considered Dr. Francis' July 2014 Medical Source Statement, his opinion that the findings therein applied to the relevant time period, and a letter authored by Dr. Francis which predated the relevant time period. (R. 38.) The ALJ found that the assessments contained in the 2014 opinion were "wholly unsupported by Dr. Francis' own benign physical examinations, the limited findings on exam by the rheumatologist, and claimant's level of activity." (*Id.*) Contrary to Defendant's assertion that the ALJ afforded the opinion "little weight" (Doc. 15 at 17), ALJ Wolfe does not state what weight, if any, she attributed to the

34

opinion.  She specifically states that she affords "no weight" to Dr. Francis' 2011 letter.  (R. 38.)  Given the language used by ALJ Wolfe, I must conclude that she rejected Dr. Francis' 2014 opinion outright.  This is important: as set out above, our Circuit Court has held that "[a]n ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion 'more or less weight depending on the extent to which supporting explanations are provided." *Plummer*, 186 F.3d at 429 (citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985)); *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008)).

In support of her assertion that the ALJ's reasoning is flawed, Plaintiff points to Dr. Mucciolo's "clinical findings of positive tender points in the trapezius, sacroiliac joint and trochanteric region, with symptoms including diffuse polyarthralgias, non-restorative sleep, sensitivity to touch and 'fibrofog.'"  (Doc. 14 at 10 (citing R. 402-12, 569-79).)  She also points to findings made by Dr. Francis.  (*Id.* (citing R. 502).)

Plaintiff's citation to the record regarding Dr. Francis' findings (R. 502) relate to Plaintiff's office visit on April 4, 2014, which post dates the relevant time period.  Furthermore, no physical examination findings were recorded and the suggested "clinical findings" are not found in the record of that visit. Rather, Dr. Francis recorded Plaintiff's subjective reports and

35

listed her problems and medications as well as his own assessment. (R. 502-04.)   The only citations to records from the relevant time period show Dr. Mucciolo's clinical findings of positive tender points in the trapezius, sacroiliac joint and trochanteric region, and symptoms which include diffuse polyarthralgias, non-restorative sleep, sensitivity to touch and "fibrofog" as reported by Plaintiff.   (R. 402,403, 411, 412.)

Because the ALJ attributed no weight to Dr. Francis' opinion, she had to point to "contradictory medical evidence" in order to reject the opinion.[6]   *Plummer*, 186 F.3d at 429.   Defendant first cites evidence from Plaintiff's one visit with Dr. Francis during the relevant time period where Plaintiff was recorded to be in no acute distress, she ambulated normally, she had good insight/judgment, and she had normal affect, normal memory, and no

---

[6]   Plaintiff emphasizes that no physician of record has opined that she is capable of performing light work, citing *Doak v. Heckler*, 790 F.2d 26, 29-30 (3d Cir. 1986), for the proposition that "where no physician suggested the claimant could perform light work the ALJ's conclusion that he could was unsupported by substantial evidence."   (Doc. 14 at 11.)

The Court rejects Plaintiff's argument that the RFC must be based on a medical opinion from a physician.   As set out by Defendant, more recent and well-reasoned decisions indicate otherwise.   (Doc. 15 at 20.)   I concur that a better reading of *Doak* and *Chandler v. Comm'r of Social Security*, 667 F.3d 356 (3d Cir. 2011), is found in *Cummings v. Colvin*, 129 F. Supp. 3d 209, (W.D. Pa. 2015), which stated that "*Doak* does not prohibit the ALJ from making an RFC assessment even if no doctor has specifically made the same findings and even if the only medical opinion in the record is to the contrary."   129 F. Supp. 3d at 215 (internal quotations and citations omitted).

evidence of psychosis.  (Doc. 15 at 18 (citing R. 364).)  Defendant also contends that "Dr. Mucciolo's treatment records state that Plaintiff had no synovitis of the small joints in her hands and wrists; no peripheral edema; and normal muscle strength, gait, and range of motion throughout."  (Doc. 15 at 18 (citing R. 385, 392, 403, 412, 569-70, 595).)

Defendant does not note that Dr. Mucciolo's September 12, 2012, examination showed a right hand tremor "as before" (R. 385) and she regularly found fibromyalgia tender positive points including trapezius, sacroiliac joint and trochanteric region (R. 385, 393, 403, 412).  Importantly, this evidence undermines ALJ Wolfe's statement that the assessments contained in Dr. Francis' 2014 opinion were "wholly unsupported by . . . the limited findings on exam by the rheumatologist."  (*Id.*)

While I find the support for Dr. Francis' opinion wanting, I more importantly find the ALJ's analysis wanting and on this basis conclude the case must be remanded for further consideration.  I find this necessary because the ALJ did not cite contradictory medical evidence in support of her rejection of Dr. Francis' opinion.  Defendant points to findings which *might* be considered "contradictory medical evidence."  However, the fact that no edema or synovitis were found during the relevant time period does not equate with a conclusion that the lack of such findings constitute "contradictory medical evidence" where no medical opinion or direct

37

evidence establishes an inherent contradiction between the findings and the limitations about which Dr. Francis opined.[7]

Furthermore, even if the evidence cited by Defendant were deemed "contradictory" neither Defendant nor the Court can do what the ALJ should have done--we cannot provide *post hoc* reasons for supporting the ALJ's decision.  It is the ALJ's responsibility to explicitly provide reasons for her decision; analysis later provided by Defendant cannot make up for the analysis lacking in the ALJ's decision.  *Fargnoli*, 247 F.3d at 42; *Dobrowolsky*, 606 F.2d at 406-07.  Therefore, reconsideration of Dr. Francis' opinion is warranted upon remand and a thorough explanation of the analysis of the opinion must be provided.

**3.    Treating Psychiatrist and Therapist Opinions**

---

[7] Plaintiff appropriately points to *Bolan v. Barnhart*, 212 F. Supp. 2d 1248, 1262 (D. Kan. 2002), to explain an ALJ's responsibility.  (Doc. 14 at 10-11.)  In *Bolan*, the district court concluded that

> [t]he ALJ is not a medical expert on identifying the clinical signs typically associated with chronic musculoskeletal pain. Thus, the ALJ is not entitled to *sua sponte* render a medical judgment of what he thinks are the clinical signs typically associated with chronic musculoskeletal pain without some type of support for this determination. The ALJ's duty is to weigh conflicting evidence and make disability determinations; he is not in a position to render a medical judgment.

212 F. Supp. 2d at 1262 (internal citations omitted).

Plaintiff next argues that the ALJ did not assign the proper weight to the opinions of Dr. Saxon and Ms. Frace. (Doc. 14 at 13-16.) Defendant maintains that the ALJ's assessments of these opinions is supported by substantial evidence. (Doc. 15 at 21-23.) I conclude this claimed error alone would not be cause for remand. However, because remand is required on the bases identified above, further explanation of the ALJ's consideration of the opinions of these treating sources is warranted.

In addition to the treating source framework set out above, additional considerations are pertinent to the opinions of Dr. Saxon and Ms. Frace. In explaining the weight given to medical opinions, the regulations recognize that more weight is generally given to the opinion of a specialist than to the opinion of a source who is not a specialist. 20 C.F.R. § 404.1527(c)(5).

Because Ms. Frace, a licensed social worker and Plaintiff's therapist, is not an "acceptable medical source" as defined in the regulations, consideration of her opinion is governed by the treatment of "other sources." 20 C.F.R. § 404.1513. The regulation provides that "other sources," including therapists, may be used to show the severity of an impairment and how it affects the claimant's ability to function. 20 C.F.R. § 404.1513(d). Social Security Ruling 06-03p, 2006 WL 2329939 (S.S.A. Aug. 9, 2006), clarifies how opinions from sources who are not "acceptable medical sources" are considered. *Id.* at *1. The ruling explains

that the distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons: 1) evidence from "acceptable medical sources" is necessary to establish the existence of a medically determinable impairment, *id.* at *2 (citing 20 C.F.R. § 404.1513(a) and 416.913(a)); 2) only "acceptable medical sources" can give medical opinions, *id.* (citing 20 C.F.R. § 1527(a)(2) and 417.927(a)(2)); and 3) only "acceptable medical sources" can be considered treating sources whose medical opinions may be entitled to controlling weight, *id.* (citing 20 C.F.R. § 404.1502 and 416.902). However, "[o]pinions from these medical sources who are not technically deemed 'acceptable medical sources' . . . are important and should be evaluated on key issues such as impairment severity and functional effects." *Id.* at *3.

ALJ Wolfe afforded little weight to Dr. Saxon's 2014 opinion because the assessment was "inconsistent with the longitudinal record, including Dr. Saxon's own benign mental examinations and claimant's level of activity." (R. 38.)

Plaintiff takes issue with the ALJ's reasoning, particularly the characterization of Dr. Saxon's findings as benign. (Doc. 14 at 14.) She asserts that the treatment records of Dr. Saxon and Ms. Frace "depict an individual struggling with depression and panic attacks, unable to maintain stability, overwhelmed and exhausted." (*Id.*) Plaintiff maintains that Dr. Saxon's opinion is

40

based on the longitudinal record which he helped to create and with which he was very familiar.  (*Id.*)  She does not otherwise elaborate on this argument but notes in the margin that Dr. Saxon's opinion is entitled to additional deference because he is a treating specialist.  (Doc. 14 at 14, n.5 (citing 20 C.F.R. § 404.1527(d)(5); *Mason*, 994 F.2d at 1067).)

While I conclude that Dr. Saxon's Mental Status examination findings and Medication Assessment findings do not correlate with conclusions reached in his July 2014 Medical Source Statement and provide a basis for the ALJ's determination that the opinion was entitled to little weight, I also conclude that when viewed in conjunction with Ms. Frace's treatment records, a more complex mental health picture is presented.  Some acknowledgment of this and additional explanation for the conclusions reached would be beneficial and should be undertaken upon remand.

**4.   Vocational Expert Hypothetical**

Plaintiff maintains that the ALJ failed to include all of Plaintiff's limitations in the hypothetical question posed to the vocational expert.  (Doc. 14 at 16.)  Defendant responds that the hypothetical question posed to the VE included all of Plaintiff's limitations supported by the record.  (Doc. 15 at 23-24.)  I conclude that because this matter must be remanded for further consideration of Plaintiff's ulnar neuropathy and Dr. Francis' opinion, the question of what limitations are supported by the

record should also be revisited.

*Rutherford* extensively reviews Third Circuit guidance concerning the issue, observing that

> objections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself.  That is, a claimant can frame a challenge to an ALJ's reliance on vocational expert testimony at step 5 in one of two ways: (1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the RFC assessment, or (2) that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert.  Challenges of the latter variety . . . are really best understood as challenges to the RFC assessment itself.

*Rutherford*, 399 F.3d at 554 n.8.

Here Plaintiff's claimed error is the latter--it is more a challenge to the RFC.  (Doc. 14 at 16.)  She claims that the ALJ erroneously omitted the limitations assessed by her treating physician and treating psychiatrist, which would compel a finding of disability if credited.  (*Id.*)

*Rutherford* clarifies that an ALJ is not required to submit to the vocational expert every impairment alleged by a claimant.  399 F.3d at 554.  Rather, the hypothetical posed must "accurately convey to the vocational expert all of a claimant's *credibly established limitations*."  *Id.* (citing *Plummer*, 186 F.3d at 431.)  Whether a limitation is credibly established is thus the crux of

42

the issue, the next question being whether the ALJ properly discredited the claimed limitation.

Case law and regulations[8] address when a limitation is credibly established. *Rutherford*, 399 F.3d at 554.

> Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response (*Burns*, 312 F.3d at 123). Relatedly, the ALJ may not substitute his or her own expertise to refute such record evidence (*Plummer*, 186 F.3d at 429). Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible–the ALJ can choose to credit portions of the existing evidence but "cannot reject evidence for no reason or for the wrong reason" (a principle repeated in *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993); [20 C.F.R. § 416.]929(c)(4)). Finally, limitations that are asserted by the claimant but lack objective medical support may possibly be considered nonetheless credible. In that respect the ALJ can reject such limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it. ([20 C.F.R. § 416.](c)(3)).

399 F.3d at 554.

Given the legal framework within which the determination is to be made, the problems related to the ALJ's consideration of Dr.

---

[8] *Rutherford* specifically identifies 20 C.F.R. §§ 416.945, 929(c) and 927) as relevant to the inquiry. 399 F.3d at 554.

Francis' opinion indicate that a determination on the propriety of the ALJ's discrediting of limitations assessed therein must also be addressed upon remand.

5.   **Limitation to Sedentary Work**

Plaintiff's final claimed error is that the ALJ improperly failed to find that Plaintiff was limited to no more than sedentary exertion and therefore disabled as of her date last insured.  (Doc. 14 at 17.)  Plaintiff cites the doctrine of *res judicata* and caselaw from the Fourth and Sixth Circuits in support of her contention that the finding by a different ALJ in her prior claim that she was limited to sedentary work is binding on ALJ Wolfe. (*Id.* at 17-18 (citing *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 840-43 (6th Cir. 1997); *Lively v. Bowen*, 858 F.2d 177, 180 (4th Cir. 1988); *Lively v. Sec'y of HHS*, 820 F.2d 1391 (4th Cir. 1987)).) Defendant responds that Plaintiff's reliance on Fourth and Sixth Circuit cases is misplaced because they are not precedential here and the jurisprudence in those circuits differs from agency policy, decisions of courts within the Third Circuit, and Third Circuit decisions.  (Doc. 15 at 24-26 (citing *Clark v. Barnhart*, 206 F. App'x 211, 214-15 (3d Cir. 2006); *Carter v. Barnhart*, 133 F. App'x 33, 35 (3d Cir. 2005); *Krokus v. Colvin*, No. 13-389, 2014 WL 31360, at *2 n.1 (W.D. Pa. Jan. 2, 2014); *Zavilla v. Astrue*, No. 09-133, 2009 WL 3364853 (W.D. Pa. Oct. 16, 2009); AR 00-1(4), 2000 WL 43774, at *3 (S.S.A.); AR 98-4(6), 1998 WL 283902, at *2

(S.S.A.)).)  In her reply brief, Plaintiff concurs with Defendant that the Third Circuit has never held that an ALJ is bound by the findings of another ALJ for a prior period of time but the circumstances of this case required the ALJ to explain her finding. (Doc. 18 at 9 (citing *Lively*, 858 F.2d at 180).)  While I agree with Defendant that the earlier decision is not binding, some explanation why ALJ Wolfe made a different finding is appropriate.

In her RFC explanation, ALJ Wolfe referenced records from the earlier time period but did not rely on them for her determination of the current claim.  (*See* R. 36-38.)  As noted by Plaintiff, the ALJ in the earlier decision concluded Plaintiff was limited to sedentary work on June 18, 2012, and ALJ Wolfe did not explain why she found that Plaintiff's RFC increased the very next day (June 19, 2012, the alleged onset date on the claim under consideration here) despite no evidence of medical improvement.  (Doc. 18 at 9.)

Explaining its decision in *Lively*, the Fourth Circuit Court of Appeals noted in *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473 (4th Cir. 1999), that in considering differing agency determinations, "common sense and logic dictated that [the plaintiff's] condition was unlikely to have improved significantly within two weeks" absent substantial evidence of improvement in the plaintiff's condition.  174 F.3d at 477.  *Albright* stressed that, rather than a *res judicata* preclusion rule, such a consideration

> is instead best understood as a practical
> illustration of the substantial evidence

45

> rule.  In other words, we determined that the
> finding of a qualified and disinterested
> tribunal that [the plaintiff in *Lively*] was
> capable of performing only light work as of a
> certain date was such an important and
> probative fact as to render the subsequent
> finding to the contrary unsupported by
> substantial evidence.

*Id.* at 477-78.

Here common sense and logic dictate that the earlier finding of Plaintiff being limited to sedentary work as of June 18, 2012, is an important and probative fact relevant to her RFC as of June 19, 2012.  Particularly in the absence of a finding that Plaintiff's condition had improved, some explanation is warranted as to why a different RFC is supported by substantial evidence.  Such an explanation should be provided upon remand.

### V. Conclusion

For the reasons discussed above, I conclude Plaintiff's appeal is properly granted.  This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: May 12, 2016